The next case on is Sleepy's LLC v. Select Comfort. Mr. Sarkozy, I think if you find that button on the left there, I think you can bring the video up a little bit. I'm not sure it's going to come up far enough. Not as far as we go, sorry. At least it's me arguing and not my kids who are even taller. Good morning. Good morning. May it please the court, my name is Paul Sarkozy from the law firm of Tannenbaum Helper in Syracuse. Sorry to mispronounce your name. It happens all the time. Tannenbaum Helper in Syracuse and Herstred LLP with me are my colleagues Donald Prutzman and Amanda Leon. With the court's permission, I'm here for Plaintiff Appellant Sleepy's LLC. With the court's permission, there are two issues I'd like to focus my arguments on. The first is that the district court's determination that there was no breach of contract pursuant to section 4C was clearly erroneous and should be reversed and remanded. And second, that this is not an exceptional case under the Lanham Act so as to warrant section 35A attorney's fees. Can I ask you a question? I find this case puzzling in many regards. One of them is, you had these shoppers who went in and they were told disparaging remarks about your client were made and the court . . . there's a difficulty there because that's not publication for purposes of slander or other defamation. But what I couldn't quite figure out is, okay, let's assume that those comments to your employees who were in there to find out what was going on, let's assume that they were in fact made and they're not actionable. One would think that the next step would be discovery of others to see if the same statements were being made to people who were not employees of yours. Was there extensive discovery trying to find out if others who had no connection with Sleepy's were being told that there were bugs in Sleepy's mattresses? I was not involved, unfortunately, in the discovery aspect of the case so I'm not in a position that I can address that. What I can say is that the theory of the case on the Lanham Act claim was that the promotion . . . that there were two types of communications that constituted the type of commercial speech dissemination that were actionable. First were advertisements and the advertisements made reference to a distinction between the polymer and the Wood Foundation, noting that . . . If you don't know the answer, then you don't know the answer and that's fine. But I was confused because it seems to me if your competitor is out making derogatory statements about you to others, even after Twombly, that's probably enough to allow you to go and take some depositions and find out whether they're making them to others, in which case it might have been actionable, depending on what they said. I understand what the Court's saying. I unfortunately just can't address that. What I do want to focus on, because I think the question that comes into play, particularly on the Section 35A Lanham Act, is was this a bad faith claim? Was there no basis for it? What I'd first ask the Court to look at in that regard is to take a look at, even though we didn't agree with it, the decision of Judge Platt, and that's at SPA Special Appendix 51 through 55 on this issue. Judge Platt's analysis discussion of the Lanham Act claim, while he disagrees with us, is written in a manner that addresses and goes through all of the elements of what we focused on and discusses, in turn, the two bases under advertising and promotion. First, the advertisements that Select Comfort made that drew a distinction between the polymer and the wood that would warp in box springs. On that issue, the Court said what we want to take a look at is what was the understanding of the term box springs in the advertising. What the Court found, unfortunately, was that the box springs, that there wasn't enough evidence from the Court's perspective to make that distinction. But the evidence that was put forward on that, I'm sorry. No, no, I'm sorry. I know you have a limited amount of time, but that's another point of curiosity from my standpoint. The Lanham Act, there was the previous appeal to this Court, doubtless in this room, of Judge Platt's earlier ruling in the case, and my understanding from a footnote in the opinion is that the Lanham Act, part of the decision was not appealed to this Court. Now, is that right? That is correct. The Lanham Act decision, we disagreed with it, but there were so many other issues, and the primary focus of this case was the breach of contract and the slander matters, and we proceeded on that basis. The Lanham Act was the tenth claim, mentioned only once in the opening statement. It was part of the case. I'm not going to say it wasn't part of the case, but to have 35A sanctions here is really the tail wagging the dog, and the reason it's the tail wagging the dog is if you look at Platt's decision and his tone on it, and if you further look at what the evidence was, I just want to bring to the Court's attention three types of evidence. First, there was the advertising, and there were extensive testimony that would box springs. Let me stop you for just a second. This is a complex case, and I, who set the time, will take full responsibility for this, but why don't we add for both sides at least five minutes to the argument time? Well, thank you. I appreciate that. You as well. We'll give you plenty of time to talk to us. Can I ask a question about the attorney's fees on the Lanham Act? Attorney's fees on the Lanham Act? Yes. Let me ask you the question. Oh, I'm sorry. I didn't hear. You mentioned bad faith, but the Octane Fitness decision in the Patent Act, which has the same language as the Lanham Act, said that bad faith is not necessary any longer. So what's the standard? What's the difference? Well, I would say that under either standard, this doesn't fall as an exceptional case. It doesn't stand out, we would submit, with respect to the substantive strength of our litigation position, considering the governing law and facts of the case or the unreasonable manner in which the case was litigated. The case was litigated on the Lanham Act issue by presenting state of mind evidence, which this Court, in its prior decision, said was not inadmissible, hearsay, because it went to the state of mind, as to what consumers meant, what they were whether it be select comfort personnel who used the term wooden box spring interchangeably with wooden foundation, or the nine pieces of testimony from sleepies personnel about how customers interchangeably would refer to wood foundation and box spring. We believed, and we submitted, that the reference to box springs in the advertisements was sufficient. Court didn't agree with that, but there was a second part, and the second part was the consistent pattern from the secret shops of the denigration, and the fact that that pattern didn't just come from nowhere. It came from, one, the brand standard manual, which is available if the Court wants to look at it at CA 224, which talks about the problem with the wood foundation, and second, from a New York meeting, a meeting with a rollout at the beginning, where the regional managers, the area managers, were pulled together to discuss the competitive advantages that select comfort had. The brand standard manual focused on the competitive advantages. If you look at Plaintiffs Exhibit 60, particularly at A1624, one of the advantages for select comfort that was mentioned was the polymer foundation versus the wood, and then when you had the secret shops, secret shop after secret shop, consistently the wood foundation was denigrated, and so under Fashion Boutique Assured Health, we argue that this was widely disseminated to the relevant purchasing public and part of a well-enforced policy to disparage through the oral statements by sales personnel. It just wasn't that there were from time to time statements by the personnel. It was that the statements by the personnel came from, one, the brand standard manual, and two, the training that was given to them, a consistent pattern that we said constituted promotion under 35A. I was thinking about the publication issue for Slander Per Se. It seems like it's a big deal for you, publication. The district court said it doesn't count if it's made to the Europe representatives and cited the Fashion Boutique of Short Hills versus Fendi case, but there are New York state court decisions that seem to be opposite to that, that publication does count if it's made to a representative of the principal. That's correct. Isn't that a linchpin to your Slander Per Se appeal here? It is a linchpin. The Teicher case is a linchpin to the Slander Per Se appeal here. We do say that the court's analysis below was simply off-base when it found that a statement made to our agent couldn't constitute publication. Is that, well, what did, in writing for this court, what did Judge LaValle say in this precise case? The court, I believe, said that that was... Because I would think, not the law of the case, I suppose, but I would think we're bound by what, at least bound by what he said, whether he was right or wrong. The court did not view this statement to the agent as being a bar. The court then focused on the consent issue, so that the question then was, was the consent, was there consent to publication? Obviously, it was all viewed through the framework of a statement that was made to the agent, because that was what the evidence that was done. So, yes, it is law of the case here. I just want to get briefly, if I could, to the breach of contract issue, because that's the other issue that I did want to address. And I would just simply submit the court overlooked or ignored the overwhelming record here. The overwhelming record, when the court said, it's ambiguous, you've got to look at the parallel evidence, the court only looked at one aspect of the parallel evidence. There are three areas that the court should focus on. One, the negotiation of the agreement. On that, there was extensive testimony by Adam Blank as to how the clause, what he called mutual representation to maintain the brand image in both his testimony and in his cover email, that's Defendant's Exhibit 4 at A1757. He said that this was an anti-disparagement defamation clause that he wanted to put into the agreement, because he had never been, Sleepy's had not been in a position where it was competing actively with someone whose brand it was selling. And so it needed that mutuality of a provision to prevent any impairment, infringement, or adversely the character, reputation, or goodwill, the brand image of the other party. What's important here is not just the testimony on the outset, but what happened afterwards. Several times in the record, you will see that when an issue of disparagement denigration as to the Wood Foundation came up, or any other issue, Sleepy's would contact Select Comfort, and Select Comfort apologized for it. Separately, after the January 3rd meeting, there's a volume of evidence about what was said at the meeting, and in subsequent emails, and in transcripts of voicemails. I point the court to CA-256, A-1591, and Mr. Blank's testimony at A-1301. That said, that what Select Comfort said is, there's no issue here in terms of needing an extra letter. It's included in the contract. That non-disparagement is included in the contract. In fact, on January 23rd, the CEO of Select . . . I hope you're getting well beyond your red light time, and you have reserved some time for rebuttal. Thank you very much, Your Honor. I very much appreciate it. Mr. Hanson. Yes, everybody gets at least five, and Mr. Hanson will probably run over, too, so we'll watch the . . . I'll list down just a tad. Would your children have to . . . Good morning, Your Honor. May it please the Court, I'm Andrew Hanson, here with my colleague Heidi Fischer from Fox Rothschild. We represent Select Comfort, and I can say, with respect to this podium, I have been lowering it consistently after Mr. Sarkozy for quite some time on this case. We've been at this for about ten years. Two judges have now decisively found in favor of Select Comfort. I understand we were sent back to a second judge once, but we have two judges who have decisively found in favor of Select Comfort. We have a decision now that Sleepy's brought and litigated this case for an improper purpose that warranted imposition of some fees under the Lanham Act. We have a holding that Sleepy's spoliated evidence, and a lot of this evidence related to the heart of the case, related to these secret shops where Sleepy's sent not just low-level employees in, not third parties they retained as agents to go do these shops. These were their managers that they sent in, and then the shop reports didn't get preserved. Any recordings they claimed to have made didn't get preserved. They said they even told the court they'd all been destroyed. Then we filed a spoliation motion. They miraculously found them. But anyway, there is a holding that they spoliated evidence. In all this time, in this decade of litigation, there's not been a single consumer who's come to court during either trial who has testified via deposition that he or she heard anything negative, disparaging, slanderous, product disparagement, you name it, from Select Comfort about Sleepy's. Not one. And in fact, prior to the case being commenced, when Sleepy's was trying to leverage Select Comfort to stay with them, keep this agreement, do an extension, Harry Acker, the CEO of Sleepy's, who Sleepy's now claims, oh, he was semi-retired. Well, he didn't come testify. But Mr. Bookbinder testified clearly. He's the boss. He was the boss. The executive committee reported to him. We have the transcript of him telling and asking the number one and number two people at Sleepy's, Mr. Acker, Mr. Bookbinder, asking all salespeople, let us know if you have ever heard any consumers complain, reference, or in any way talk about anything negative that a Select Comfort salesperson has said about Select Comfort products sold at Sleepy's. What's wrong with that? That's fine to ask. He received zero responses. Zero. This is right before they commenced the action. Let me ask you this. Yes. You're talking now, really, what you're talking about, and for understandable reasons, is legal fees. I mean, a substantial award, very substantial award, even after its cut of legal fees. And my question is simply, to what extent is the grant of those legal fees dependent on the fact that there was originally, there was one count in the one alleged cause of action based on the Lanham Act? I mean, hypothetically, they never brought it. They never heard of the Lanham Act, and they never brought it. Everything else they did, but no Lanham Act. Would you have the same legal right to legal fees then that you assert you have now? I think we would have a path to legal fees through spoliation, through bad faith bringing of the litigation. The path we took, though, was through the Lanham Act. So, yeah, the award we have- Before you get there, the path that you're suggesting you might have had is one in common law, right? Yes. Yes, Your Honor. So, yeah, the statutory path that we took- I mean, I'm more, what's the word? I'm more moved by the notion that you're saying there was bad faith, which has nothing really to do with the Lanham Act, rather than the fact that, I mean, you know how often you read a complaint, whether you're sitting on that side of this bench or this side, how often you read a complaint, and some of the strangest, when you get towards the end count seven or eight, the most absurd claims are made based on law that obviously doesn't apply. Some lawyer thought, well, you better put it in. We see that all the time. I saw it in practice. You see it in practice. And my question is to what- the so-called tail wagging the dog. To what extent is the Lanham Act, which really played a relative- from what we now see, played a relatively small part in this and no part since it went through this court last time. To what extent are we worrying about Lanham Act? To what extent was that not just something that they slapped on and shouldn't have slapped it on because they didn't realize that they might open them up to legal fees? Let me speak first to the- none of the fees we've been awarded relate to anything since we were here last time. So those have all been taken off the table. But with respect to Lanham Act, I select comfort, and certainly I viewed it as a significant claim. Slander per se claims, which are most of the 12 they've claimed, certainly most of them are actually product disparagement claims that they didn't plead. But two or three slander per se claims, quite frankly, are not that concerning from when you're talking a big litigation between two companies. But a Lanham Act claim where they're claiming there's this widespread dissemination that it is widespread that select comfort people have embarked on this pattern and this scheme to slander, to denigrate Sleepy's products, which are actually select comfort products sold in Sleepy's stores, was a big deal to us. So this case became a not big deal when the Lanham Act was dropped on appeal? I wouldn't say that, Your Honor. I would say because if you looked at the exposure, when you get the complaint and when you start getting into discovery and you have to talk and analyze the exposure, limited instances of slander that are only said to an employee of the plaintiff. There's really not a great avenue for damage there. The breach of contract claim, for example, even if their theory of the contract was correct, and how could possibly there be any damage to adversely affect their goodwill when a comment was only made to their employee? So I'm not trying to downplay it, but it was significant. I understand it right. You're saying at least up through until the prior proceedings in this court. To you and to your client, this was essentially a Lanham Act case and that was the principal problem it was facing. That's what you're . . . We view that as the most significant claim we were dealing with. Yes. Can I go back to the slander per se? Yes. I was asking opposing counsel about. It seems as if the district court may have gotten it wrong about publication under New York law, but then moved into the discussion of consent. The prior panel here, Judge LaValle talked a lot about consent. First of all, did the district court get it wrong about not citing Teichner and recognizing that New York publication permits agent communications? Secondly, does it matter given the consent discussion? I'll answer both and then I'll discuss both. No, the court didn't get it wrong and it doesn't matter anyway, but . . . It does not matter. Does not matter, yes. With respect to the publication of an agent, this is a different situation than like the Teichner case and these other cases where parties have hired agents. They have hired third parties or they're individuals that have someone that's doing some work for them. Here, the agents are managers of the corporation. What difference does that make? I think the difference is these employees, these managers, that was their only role. They are the company. They were the company when they went out. They were sleepies. They were charged by a sleepie CEO to go out and do these secret shops. They were given scripts. Any New York cases recognize this distinction? You're either an agent or you're not? They do not. In fact, we couldn't find any cases in the country, in fact, that recognized the distinction or discussed it the other way and said, no, that doesn't apply. How is that distinguishable from a comparison shopping, which I gather is a profession, people going out for one person saying, what are they saying about their product and what do we do about it? I would think in that instance where you're hiring a third party to go do it, a secret shopping outfit, a private investigator, that person or that entity is receiving that information as that person or that entity. Here, all you have are individuals that were sent out by a company and are receiving the information solely in their role as managers of sleepies, not in any individual capacity whatsoever. The information negative about sleepies is being told to sleepies itself. But under, at least as I understand corporate law and agency and all of that, I mean, these are juridical entities, but they're acting through their agents who happen to be managers or agents from the outside who are hired. So I'm having a hard time grasping the difference. And I think, Your Honor, this is where we roll into the consent issue, is that they are charged by sleepies with going out and obtaining this information. They were charged by sleepies to go out, perform these secret shops. They called it a blitz. They wanted them to go do it. They gave them scripts to go do it. And so they were not going out and doing it as, you know, individuals. They were not going out and doing it to satisfy their curiosity and their sales process. The scripts in the record, are they preserved? Pardon me? Are those scripts, any of them, in the record, the unappealed? Most of the scripts were not preserved. There was, I believe there was one script that we think we found, but it went through, it wasn't the true script. It ended up tacked onto something else. That was one of the issues we had in this case, was that the scripts were, and in fact, I recall now, there's been a lot that's gone on in 10 years, so sometimes it takes me a moment, but I believe the script that we found was a script that was responded to by one of the shoppers that, you know, that asked questions. Is all of that part of your spoliation claim or not? It was, it is, yes. Because the spoliation just wasn't scripts, but it was actually when these shoppers would go out and they'd come back and say, oh, this is what they said, they would give notes, but the notes weren't preserved. The notes disappeared. And when they were, when they did show up, they wouldn't be in the same way that the shoppers had prepared them. They wouldn't be the shopper's notes. They were altered by some unknown person. So we didn't, we didn't have that information. Testimony about the scripts? There is testimony about the scripts, yes. Did one of these people who went into the store testify that, yeah, I was told to ask these questions and I was handed a script? Yes. Something like that? Yes. Just, I don't know if you want me to change course here with the remaining time I have left, but I did want to talk about Octane Fitness. I do think Octane Fitness changed the standard to apply fee, when an award of fees and the analysis for fees. This circuit had applied a bad faith or fraud standard, and then the lower courts in the circuit had applied three different criteria that Judge Sabert did apply. Octane Fitness, I think, lowers that standard. So if Judge Sabert's award was good under the old standard, it's certainly good under the Octane Fitness standard, which just says, does the litigation stand out from ordinary litigation, or was there litigation misconduct? In this case, Judge Sabert found, yes, there was litigation misconduct. That was the spoliation. Judge Sabert also found that the litigation was commenced for an improper purpose. And that improper purpose was seen in the statements made by the CEO of Sleepy's, when he wanted to go out and generate this enormous, fabulous lawsuit against Suck Comfort. And he even said in there the reason why he wanted to do it. He wanted to do it because it was going to hurt him in the industry. And he said, well, it's not going to hurt him with consumers, but it's going to hurt him in the industry. And where it was going to hurt him was, he's going to make a point that none of these other retailers should do business with Select Comfort, because this is what they do. So we'll sue him for it. And that was a big part of why Judge Sabert awarded fees. If you have no other questions, I will yield the rest of my time. Thank you, Mr. Hanson. Off we go. Mr. Sarkozy, you have reserved three minutes. Thank you. Let me start out addressing an issue as to the relative weight of these various claims. Please go and look at the opening statements. The Lanham Act claim is mentioned only once by us, equally significantly. Select Comfort's opening statement only refers to the Lanham Act claim. To note that Sleepy's Damages Expert performed no separate analysis of damages based on the Lanham Act claim. When was this happening relative to our decisions? Is this after or before? This is before. This is the beginning of the case. Beginning of the case. Lanham Act was hardly addressed, not only by us, but by Select Comfort. And Select Comfort noted that there were no great, fabulous damages that came from the Lanham Act. So it was a trial before Judge Platt, then? It was. That's all. It was a trial. Yes. So I would submit that the Lanham Act is not as trumped up as Select Comfort has made it seem. On the issue of testimony, on the issue of spoliation, let me just give some context to the conversation with Harry Acker that Judge Platt never commented on in his decision at all. There was no live fact witness testimony before Judge Sybert. So Judge Sybert read this one tape, this one exhibit, and from that, and from that, determined what Sleepy's motive was. But if you look at Adam Blank's testimony about what happened, Blank said, and this is at A1299, he spoke to Acker after Acker had this and essentially calmed him down. He said, we were going to try to resolve this as business and partners and not jump into unnecessary litigation. We agreed not even to discuss or pursue a lawsuit. And even though in the tape Acker said we should get Adam Blank involved and we should get an outside lawyer, Blank said, we did not get an outside lawyer on. What happened at that point was secret shops were undertaken, because there had already been some information that there had been this disparagement. The secret shops were undertaken. Then the process of what was done, and it was consistent for secret shops throughout Sleepy's history, was the secret shopper would record it or would take notes on it, would send an email. The email or the tape would be transcribed by one person, Sam, who reported to Mike Bookbinder. And you can see so many things in the record where there are, in a particular format that Harry Acker required, secret shops, other calls, memos, et cetera. This was standard process. The tapes were then recycled. Now, perhaps at some point they should not have been recycled. Was it, does it meet the Second Circuit standard for spoliation sanctions? Absolutely not. There's no evidence or finding that there was extrinsic evidence, that missing evidence would support the proposition that select comfort asserted. Did the district court in any of its forms, did it address directly the spoliation question? The spoliation questions were addressed in one, in a couple of footnotes. And the, this is Judge Seibert, not Platt. Seibert found that there was spoliation. She said no sanctions would be issued. Now, she said no sanctions would be issued because it would be irrelevant based on the rest of her decision. But she did not undertake a finding as to whether or not the threshold would be met. I submit it wouldn't. And I would submit that there's no basis for Lanham Act attorney's fees to come without following that step, particularly in light of all the other bases supporting the Lanham Act claim. Thank you. Unless my colleagues have further questions. Thank you very much. Thank you, Your Honor. Thank you both for your arguments. We will reserve decision in this case.